UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| THEODORE M. COX, | ) | Civil Action No.: 4:19-cv-02717-TER |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **ORDER** |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security; | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for disability insurance benefits (DIB).  The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied.  This action is proceeding before the undersigned by

consent pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I.  RELEVANT BACKGROUND

### A.     Procedural History

Plaintiff filed an application for DIB on July 27, 2010, alleging inability to work since July

7, 2010. (Tr. 136-42, 210).  His claims were denied initially and upon reconsideration. Thereafter,

Plaintiff filed a request for a hearing. A hearing was held on September 14, 2012, at which time

Plaintiff and a vocational expert (VE) testified.  (Tr. 37-60). The Administrative Law Judge (ALJ)

issued an unfavorable decision on December 6, 2012, finding that Plaintiff was not disabled within

the meaning of the Act. (Tr.17-34).  Although the Appeals Council denied review on June 21, 2013,

this Court reversed the Commissioner's final decision and remanded for further administrative action

in an Order dated September 17, 2014, finding  the ALJ's determination that Plaintiff's seizures,

plantar fascial fibromas, and ulnar nerve entrapment are not severe impairments was not supported by substantial evidence and that the ALJ erred by not addressing Plaintiff's sensorineural hearing loss, vertigo, migraine headaches, and degenerative disc disease of the lumbar spine. (Tr. 1-4, 716-42). On remand, the ALJ again issued an unfavorable decision, dated June 15, 2015. (Tr. 633-47). Plaintiff requested review of the ALJ's hearing decision, but the Appeals Council stated it "found no reason under [its] rules to assume jurisdiction" in a letter dated November 9, 2015. (Tr. 625-28). Plaintiff again appealed to this Court on August 17, 2015. On February 16, 2017, the undersigned again remanded this action to the agency, finding the ALJ did not set forth Dr. Weissglass's actual opinions or assign a weight to those opinions, the ALJ's credibility determination was not supported by substantial evidence because the ALJ relied, in part, on a 2010 Function Report without acknowledging Plaintiff's more recent testimony, and the ALJ did not discuss headaches or their impact on Plaintiff's ability to engage in sustained work activities. (Tr. 1293-1308). On May 3, 2018, another hearing was held. (Tr. 1227-1267). On June 6, 2019, another hearing was held. (Tr. 1485-1505). On July 18, 2019, for a third time, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled from July 7, 2010 through December 31, 2014. (Tr. 1217). On September 25, 2019, Plaintiff appealed for a third time to this Court. (ECF No. 1).

## B.     Plaintiff's Background

Plaintiff was born on January 9, 1966, and was 48 years old at the time of the date last insured. (Tr. 1215). Plaintiff completed his education through high school and has past relevant work experience as an electrician. (Tr. 1215). Relevant medical records will be summarized under pertinent issue headings.

**C.    The ALJ's Decision**

In the decision of July 18, 2019, the ALJ made the following findings of fact and conclusions

of law (Tr. 1217):

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 7, 2010 through his date last insured of December 31, 2014 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disk disease; osteoarthritis; and disorder of the muscle, ligament, and fascia of the left upper extremity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: could occasionally perform postural activities; could occasionally operate foot controls; could frequently reach, handle, and finger; could never reach overhead; and must avoid concentrated exposure to heights and hazards.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 9, 1966 and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience,

3

and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from July 7, 2010, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in the evaluation of opinion evidence from examining consultants  Dr. Rojugbokan and Dr. Weissglass. Plaintiff argues the ALJ did not properly assess the impact of Plaintiff's ulnar nerve entrapment in determining the RFC. Plaintiff argues the ALJ failed to properly assess the impact of impairments of explosive personality disorder, migraines, seizure disorder, and plantar fascial fibromas in formulating Plaintiff's RFC.  Plaintiff argues the ALJ made similar errors as addressed in prior remands from the court in evaluating Plaintiff's subjective complaints. Defendant argues the ALJ addressed the court's concerns and provided logical explanation of a careful consideration of the record in making the required findings.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.  42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated

under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant

bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §

423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability

to return to PRW, the burden shifts to the Commissioner to come forward with evidence that

claimant can perform alternative work and that such work exists in the regional economy.  To satisfy

that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs

available in the national economy that claimant can perform despite the existence of impairments

that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the

Commissioner satisfies that burden, the claimant must then establish that he is unable to perform

other work.  *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*,

482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the

Commissioner [ ] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of

that federal court review is narrowly-tailored to determine whether the findings of the Commissioner

are supported by substantial evidence and whether the Commissioner applied the proper legal

standard in evaluating the claimant's case.  *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971);

*Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the

evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the

court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**B.    ANALYSIS**

**Migraine Headaches**

Plaintiff notes the undersigned previously remanded based on the ALJ's failure to discuss headaches or their impact on Plaintiff's ability to engage in sustained work activities in the RFC determination, where the prior ALJ found migraine headaches as a severe impairment and only made a conclusory statement that treatment was conservative. (Tr. 1307, 635). Plaintiff argues the 2019 ALJ's finding that migraine headaches were non-severe through the DLI because complaints were sporadic and unsubstantiated by exams and imaging introduces further error than the prior, still present error that the court previously remanded on the issue of migraines.

The 2019 ALJ found that headaches either did not last longer than twelve months "and/or" did not cause significant limitations in ability to perform basic work functions and were non-severe, stating that Plaintiff's complaints of headaches were sporadic and unsubstantiated by normal neurological exams and imaging. (Tr. 1209). The ALJ later summarized some of Plaintiff's testimony that Plaintiff suffered from migraine headaches 2-3 times per week characterized by nose

7

bleeds, vomiting, photophobia, and audio phobia. (Tr. 1212).

Plaintiff asserts that his headache complaints being deemed "sporadic" by the ALJ is not supported by substantial evidence. The record displays the following.  In September 2010, Dr. Worthington noted that Plaintiff complained of increasing migraine headaches. (Tr. 373). In January 2012, Plaintiff reported to the Hand Center that he had migraines. (Tr. 476). At the September 2012 hearing, Plaintiff testified migraine headaches were a residual problem from his 1995 electrocution injury and he experienced increased migraines after a chiropractor adjusted his neck in June 2012. (Tr. 42,45, 564). In 2012, Plaintiff testified his migraines occurred at least once a week and lasted 3-6 hours. Plaintiff last had a migraine on the prior Saturday, Sunday, and Monday. (Tr. 45). Plaintiff reported that he could not perform normal activities and was incapacitated during a migraine. (Tr. 45, 53). In August 2012, Plaintiff reported to Dr. Rogers that serious migraines occurred up to four times a month and lasted for hours at a time. (Tr. 571-572, 578-579).  Dr. Rogers prescribed medications for migraines, but insurance denied coverage. (Tr. 579, 572). In October 2012, a review of systems indicated headaches. Plaintiff reported four migraines monthly, aggravated by light and noise and relieved by Imitrex and Maxalt with additional symptoms of photophobia, nausea, and visual aura. (Tr. 569, 571).  Under plan about migraine headaches, Plaintiff was unable to secure an adequate supply of Imitrex from Medicaid and Maxalt was subject to prior authorization.  Samples of Maxalt were given. (Tr. 572). In October 2012,  Plaintiff reported migraine headaches and two prescriptions for migraines to Dr. Weissglass. (Tr. 610-611). In October 2012, Dr. Lembo noted plan to do a greater occipital nerve block once seizures were under control due to an increase in headaches. (Tr. 961). In September 2012, October 2012, December 2012, and January 2013, Plaintiff reported headaches. (Tr. 954, 958, 960, 962).  In January 2013, Plaintiff was

seen at the emergency room with an occipital headache after a lumbar puncture. (Tr. 1179). Treatment was a blood patch by anesthesia. (Tr. 1182). In November 2014, Plaintiff was still suffering from headaches. (Tr. 1087-88).[3]

Plaintiff argues the ALJ's other reason for finding migraines non-severe is not supported by substantial evidence because normal neurological exams and imaging cannot determine occurrence/frequency or severity of migraines. "[E]vidence of migraines and other headaches does not normally or necessarily appear on standard imaging tests, and thus there will often be no "objective" evidence of migraine headaches." *See Robinson v. Colvin*, 31 F. Supp. 3d 789, 793 n1 (E.D.N.C. 2014)(*citing Duncan v. Astrue*, No. 4:06–CV–230–FL, 2008 WL 111158 *7 (E.D.N.C. Jan. 8, 2008) (noting that migraine headaches are a condition that cannot be diagnosed or confirmed through laboratory or diagnostic testing and listing cases holding same); *Harrington v. Colvin*, No. 7:15-CV-00020-FL, 2016 WL 320144, at *4 (E.D.N.C. Jan. 4, 2016), *report and recommendation adopted*, 2016 WL 311284 (E.D.N.C. Jan. 25, 2016)(an ALJ's reliance on normal imaging "merely suggests that the cause of her headaches cannot be identified through such testing, not that she does not suffer from headaches," citing cases that found "migraines cannot be diagnosed or confirmed through laboratory or diagnostic testing); *Moss v. Berryhill*, No. 2:16-CV-05016, 2017 WL 4296637, at *21 (S.D.W. Va. Apr. 27, 2017), *report and recommendation adopted,* 2017 WL 4294206 (S.D.W. Va. Sept. 27, 2017) (an ALJ erred in discounting a claimant's credibility on the

---

[3] Past the DLI, at the second hearing in 2015, Plaintiff testified his migraines had worsened and occurred twice a week lasting all day. (Tr. 672-673). Plaintiff used Imitrex injections as an abortive. (Tr. 673). Migraines and the accompanying treatment incapacitated him for the rest of the first day into the next day. (Tr. 673). At the third hearing, Plaintiff testified headaches did not resolve and were continuing now up to three times a week. (Tr. 1241). Plaintiff testified the Imitrex injections incapacitated him for the rest of the day. (Tr. 1241). In March 2015, Plaintiff continued to report to treating physicians frequent or severe headaches. (Tr. 1087). At a 2018 exam, Plaintiff still reported headaches. (Tr. 1468).

basis that she complained of migraine headaches even though her brain MRI was normal); *Brownlee-Nobs v. Colvin*, No. 1:14-CV-03988-JMC, 2015 WL 5908524, at *15 (D.S.C. Oct. 7, 2015)("It is impossible to gauge ...the frequency of her migraines through any objective tests...").[4]

Besides the ALJ's finding of migraines as non-severe based on allegedly sporadic nature of complaints and normal imaging/tests not being supported by substantial evidence, the ALJ also did not consider in the RFC determination the "non-severe" migraine impairment's effects on sustaining work; such specific issue had been previously remanded. Regulations require that an ALJ "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe," in determining the claimant's RFC. 20 C.F.R. § 404.1545(e); *see also* SSR 96–8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' "). Moreover, this court previously ordered Defendant to consider the effect migraines had on sustaining work as the ALJ is required to "discuss the claimant's ability to 'perform sustained work activities in an ordinary work setting' on a regular work schedule." (Tr. 1307(citing *Flynn v. Colvin*, Case No. 5:13-cv-00597-DCN, 2014 WL 4199054, at *8-*9 (D.S.C. Aug. 20, 2014) (quoting SSR 96-8p, 1996 WL 374184)). The ALJ failed to consider the effects of migraines and thus the RFC narrative and determination also are unsupported by substantial evidence as the ability to sustain work given the impairment of migraine headaches was not discussed by the ALJ.

Also, in addition to no objective testing, the ALJ relies on the sporadic nature of the claimed

---

[4] *See also Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97 (4th Cir. 2020)("ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence.").

condition – migraines – for not addressing migraines in the RFC discussion. As set forth above, a lack of objective evidence for this condition is not a basis alone to discount the claimant's complaints. Thus, the remaining explanation — sporadic nature of the condition remains as support for the ALJ's conclusion. However, as set forth in the evidence cited above, the claimant made multiple complaints of migraines over the course of his treatment and in his testimony. Thus, Defendant fails to show the ALJ supported his decision with substantial evidence by not including in his RFC discussion migraines, whether or not a severe impairment, and their effects.

This is the third instance in this case that an ALJ's findings regarding Plaintiff's migraine headaches has been found by the court not to be supported by substantial evidence. First, in 2012, the ALJ's opinion failed to discuss the impairment; after that remand, in 2015, the ALJ acknowledged the impairment and found it severe but failed to consider the impact on sustaining a workday/week in the RFC determination; after the second remand, in 2019, the ALJ found migraine headaches non-severe based only on the characterization of "sporadic" complaints and erroneously relied on the absence of objective medical evidence of migraines, and further did not consider the effects of migraine headaches in the RFC determination as required by SSR 96-8p. (Tr. 737-38, 740; 1307; 1209). Unfortunately, the ALJ again fails to properly and appropriately address this issue. Substantial evidence does not support the ALJ's treatment of migraine headaches at both steps at issue.

**Opinions**

Plaintiff argues the ALJ erred in the evaluation of opinion evidence from consulting examiners Dr. Rojugbokan and Dr. Weissglass.

Medical opinions are statements from acceptable sources that reflect judgments about what

11

you can still do despite impairments and about your physical or mental restrictions. 20 C.F.R. § 404.1527. The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. § 404.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v.*

*Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).[5]

Dr. Rojugbokan

As to Dr. Rojugbokan of Prime Care Family Practice, the ALJ stated:

In July 2011, the claimant saw Adebola Rojugbokan, M.D. for a consultative examination. Upon examination, the claimant had a normal ear exam and no damage to the external auditory canal with tympanic membrane intact. His hearing was normal as well. The claimant had a full range of motion in his neck. The claimant had a normal gait. He could heel-toe walk and did not use an assistive device for ambulation. He had normal alternating hand motion and finger-to-nose motion. The claimant had normal neurological functioning with intact sensation in all areas. His psychiatric exam was also grossly normal. Dr. Rojugbokan indicated that the claimant was capable of walking listening, seeing, hearing, reasoning, and managing his own funds. (Exhibit 7F).

(Tr. 1212). Later, the ALJ weighed Dr. Rojugbokan's opinion:

As for the opinion evidence, I give great weight to the July 2011 findings of Dr. Rojugbokan that the claimant was capable of walking, listening, seeing, hearing, reasoning, and managing his own funds. While it is not wholly specific, it is consistent with the claimant's examination findings, including normal coordination, intact strength, and normal neurological/musculoskeletal findings, as well as his improvement in pain after his re-fusion, his wide range of activities of daily living, and his other treatment notes of record. (Exhibit 7F).

(Tr. 1214).

Dr. Rojugbokan's opinion at Exhibit 7F actually displayed an examination report on July 20,

_____

[5] Recently, the Fourth Circuit Court of Appeals expounded on the 20 C.F.R. § 404.1527(c)(1)-(6) factors. While there are no treating opinions here and the opinions at issue are examining consultants, such recent case law further supports remand. Even when a treating opinion is not entitled to controlling weight, "it does not follow that the ALJ ha[s] free reign to attach whatever weight to that opinion that he deem[s] fit." *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385 (4th Cir. 2021). It must be "apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." *Id.* at *5. Where only the factors of supportability and consistency were discussed by the ALJ and other factors of length, frequency, nature, and extent of treating relationship were ignored, it was error necessitating remand. *Id.* at *5. "20 C.F.R. § 404.1527(c) requires ALJs to consider *all* of the enumerated factors in deciding what weight to give a medical opinion." *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 107 n.16 (emphasis in original).

2011 and an addendum dated the same date. (Tr. 408-412). The first examination page noted a normal gait and opined Plaintiff was capable of walking. (Tr. 410). The addendum noted inapposite: "The patient, however, tended to limp and had a cane that he used as a form of ambulating an assisting device. Therefore, the patient has a slight ataxia." (Tr. 411). The ALJ here gave great weight to an opinion based on internally inconsistent exam findings where the ALJ only cited to the normal gait without mention or resolution of the consultant's exam also stating Plaintiff walked with a cane and limp. (Tr. 1212, 1214). The report has other inconsistencies. The addendum contained an inaccurate medical history. Dr. Rojugbokan stated Plaintiff injured his cervical spine in June 2007 (Tr. 408), when the injury occurred in June 2010. (Tr. 310, 317, 347-48, 356-57, 351). Dr. Rojugbokan mentioned the second surgery in February 2011 and not the one in July 2010. (Tr. 408).The only impairment Dr. Rojugbokan noted was status post spinal cord damage and status post neck surgery, whereas Plaintiff was seeking disability based on a multitude of impairments. (Tr. 410). Plaintiff argues this was not a comprehensive opinion.   Dr. Rojugbokan only reviewed one medical record from Dr. Worthington and one report of a CT scan of the cervical spine, whereas another consultant reviewed many more records. (Tr. 408, 411).  It is unclear which exam underlies his opinion.  Plaintiff speculates it is unclear if part of one of the exams does not relate to Plaintiff at all.   Plaintiff argues further error resulted by giving greater weight and deference to Dr. Rojugbokan without addressing his conflicting internal exams, than to Dr. Weissglass, who is argued to have completed a more thorough record review and examination. (Tr. 608-622).

The ALJ failed to mention, consider, or address the internal conflicting exams of a one-time visit within Exhibit 7F before relying on it and giving it great weight. Defendant argues even if there is error in the report as to gait, it is not harmful because of other exams of normal gait. However, the

great weight given by the ALJ to Dr. Rojugbokan's opinion on walking would be unsupported by substantial evidence if inconsistent with the only exam performed by Dr. Rojugbokan. Plaintiff also responds that the conflict goes beyond gait. (ECF No. 29 at 7). Substantial evidence does not support the ALJ's giving of great weight to Dr. Rojugbokan because the ALJ did not consider the internally conflicting exam supporting Dr. Rojugbokan's opinion.

Dr. Weissglass

Plaintiff takes issue with the ALJ's valuing consultant Dr. Rojugbokan's opinion at great weight and consultant Dr. Weissglass only at little weight for the opinion that combination of impairments were such that Plaintiff could not pursue gainful employment, some weight to "finding that the claimant could occasionally lift and carry 10 pounds with no frequent lifting/carrying and could occasionally bend at the waist as such limitations are consistent with the claimant's history of fusion surgeries as well as his osteoarthritis," and no weight as to findings about sustaining attention because it was unsupported by the record and based on subjective complaints. (Tr. 1214-1215). The ALJ went on to give significant weight to non-examining consultants. (Tr. 1215).

On October 25, 2012, Barry Weissglass, M.D., who is board-certified in family medicine and occupational medicine, took Plaintiff's history, examined Plaintiff, and completed an assessment. (Tr. 608-622). Dr. Weissglass noted Plaintiff's history of seizures, neck problems, cubital tunnel syndrome, fascial fibromas, low back pain, hearing loss, left shoulder pain, migraines, decreased feeling in right hand, and remission of Crohn's since 1979. (Tr. 609-610). Dr. Weissglass noted daily activities of watching television, taking a short walk outside, and for the remainder of the day lying on the couch or in bed. (Tr. 610). Dr. Weissglass reviewed medical records from Carolina Spine and Rehabilitation, Palmetto Primary Care, Summerville Medical Center, Charleston ENT, Lowcountry

Hand Center, Roper Hospital, Lowcountry Orthopedics, Dr. Rojugbokan, and Dr. Worthington. (Tr. 610). Dr. Weissglass noted cubital tunnel syndrome affected the upper extremity. (Tr. 611). Medications of Benadryl, hydromorphone, fentanyl patch, Ambien, Paxil, Depakote, Maxalt, Imitrex, meclizine, Elavil, Zanaflex, Lyrica, and Norco were noted. (Tr. 611). Plaintiff does not drive. (Tr. 611). Upon exam, Plaintiff had a moderately antalgic gait leaning forward and slightly to the right and requiring some assistance getting on and off the exam table and out of the chair. (Tr. 612). There was poor light reflex in the right ear. Plaintiff had decreased sensation along the left third through fifth fingers, primarily the lateral aspect of the third finger. The entire right hand had decreased sensation to touch. Left elbow extended to 0 and flexed to 120 and was painful along the ulnar border and along the site of the "capital tunnel." (Tr. 612). Both feet had large tender masses along the mid medial border of the arches. (Tr. 612). Plaintiff had Dupuytren's contracture involving the left fourth and fifth fingers with mild to moderate tenderness and decreased range of motion on extension. (Tr. 613). Neck and back exams are noted in detail. (Tr. 613). Assessment was "the combination of impairments from his multiple orthopedic and medical problems are such to a medical certainty he could not pursue gainful employment." (Tr. 613). Restrictions specifically noted were:

> •As to the patient's lumbar spine: The patient should avoid activities that require repetitive use of the back muscles, holding the back steady in one position for long periods of time or requiring the back to remain in an awkward posture repetitively or for any length of time. The patient should also avoid bending, lifting and twisting and prolonged standing, sitting, and driving. The patient should alternate positions frequently.

> •As to the patient's cervical spine: The patient should avoid activities that require repetitive use of the neck muscles, holding the neck steady in one position for long periods of time or requiring the neck to remain in an awkward posture repetitively or for any length of time.

16

•As to the involved shoulder, elbow and hands: The patient should avoid activities requiring the use of the involved parts of the upper extremities at or above shoulder height or with repetitive lifting or movement of objects from lower down up towards the patient's shoulder height or with repetitive use or lifting of objects against resistance involving the use of his left elbow and left hand. This is particularly true for objects requiring repetitive motion and that have significant resistance.

(Tr. 613). Plaintiff could occasionally lift/carry 10 pounds, occasionally bend at waist, and stand/walk less than 2 hours in a workday. (Tr. 615-616). No answers as to cane were given. (Tr. 616). Plaintiff was not limited in the right upper extremity. (Tr. 616). Plaintiff was limited in push/pull of left upper extremity. (Tr. 617). Plaintiff could sit less than 2 hours of a workday. Plaintiff needed frequent position changes every 15-20 minutes and to alternate sitting and standing every 20 -30 minutes. Plaintiff needed unscheduled breaks for pain relief. (Tr. 617). Plaintiff could occasionally hold neck in static position or look in any direction. (Tr. 618). Plaintiff could reach in all directions continuously with right upper extremity. (Tr. 618). Plaintiff could reach in all directions occasionally with left upper extremity but never above shoulder height. (Tr. 618). Plaintiff could constantly handle with the right, but only occasionally with the left. Plaintiff could only finger occasionally with the right due to loss of sensation. (Tr. 619). Plaintiff could only occasionally finger with the left arm due to pain and loss of strength. (Tr. 620). Plaintiff had a significant limitation in ability to concentrate, remain alert, think clearly, or otherwise attend to tasks to completion during a workday due to pain, fatigue, sleepiness, dizziness, nausea, lightheadedness, and side effects of medication. The degree of limitation was 50% or more of workday/workweek. (Tr. 621). Plaintiff would be absent 4 or more days a month due to increased symptoms or treatment. (Tr. 622). No significant improvement was expected. (Tr. 622).

The ALJ only addressed and weighed the limitations opined by Dr. Weissglass regarding the

17

general disability statement, lift/carry, bending, reaching as to left upper extremity, and sustaining attention generally. The ALJ did not weigh or address the handling and fingering limitations, medication side effects, absences, sit less than 2 hours, and alternating position limitations. Moreover, the ALJ did not address the supportability and consistency 20 C.F.R. § 404.1527 factor as required. In theory, Dr. Rojugbokan's exam of abnormal gait, unaddressed by the ALJ, which overall opinion was given great weight by the ALJ, could provide support and consistency with the exam of Dr. Weissglass of abnormal gait. Further, other treating doctors noted possibly supporting and consistent exams as to some of the other limitations opined by Dr. Weissglass, which is for the ALJ to consider, weigh, and resolve as to such supportability and consistency factors in the first instance. (Tr. 470, 485, 495, 499, 523, 527, 530, 556, 558, 562, 473, 886, 888,890, 892, 894, 896, 898, 900, 934, 1065).

The ALJ is obligated to consider all evidence, not just that which is helpful to his decision. *Gordon v. Schweiker*, 725 F.2d 231, 235-36 (4th Cir. 1984); *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987). The ALJ did not properly evaluate all of the 20 C.F.R. § 404.1527(c) factors in relation to the evidence in the record. "The ALJ's failure to 'build an accurate and logical bridge from the evidence to his conclusion' constitutes reversible error." *Lewis v. Berryhill*,858 F.3d 858, 868 (4th Cir. 2017)(internal citations omitted). Based on the foregoing, the court can not find that the ALJ's decision was supported by substantial evidence, as to the findings in regard to Dr. Rojugbokan and Dr. Weissglass, and remand is appropriate.

**RFC: Upper Extremity**

Previously, the undersigned specifically found that the prior ALJ's finding that Plaintiff's seizures, plantar fascial fibromas, and ulnar nerve entrapment were not severe impairments was not

supported by substantial evidence. (Tr. 737). Plaintiff now argues the ALJ failed to mention the impairment of ulnar nerve entrapment, but acknowledged a severe impairment of "a disorder of the muscle, ligament, and fascia of the left upper extremity." (Tr. 1209).

Regardless of nomenclature, the root of the issue is whether the ALJ appropriately provided an explanation from the evidence to the conclusion of the RFC found. Specifically, at issue here is the frequency of usage of the upper extremities.

Evidence in the record regarding the upper extremity is summarized as follows. Dr. Lembo ordered an EMG/NCS study that was performed in December 2011, which showed multiple positive findings that confirmed the diagnosis of chronic left C5 and C6 radiculopathy and cubital tunnel syndrome. (Tr. 499). Dr. Allen confirmed that EMG/NCS findings showing cubital tunnel syndrome and diagnosed medial epicondylitis of the left elbow. (Tr. 473). On physical examination, Dr. Allen found positive Tinel sign around the cubital tunnel at the elbow, positive tenderness to palpation of the medial epicondyle, symptom aggravation with wrist flexion and forearm pronation, and reduced muscle strength (4+/5) in both arms in the first dorsal interosseous muscle. (Tr. 473).   Dr. Allen recommended cubital tunnel release surgery based on these findings (Tr. 473-74), but Plaintiff was never medically cleared to undergo the surgery by Dr. Lucas, his treating neurologist, because Dr. Lucas was still evaluating Plaintiff's seizure disorder. (Tr. 47, 477, 493, 559). Plaintiff demonstrated decreased muscle strength and grip strength of the left extremity on physical examination, (Tr. 44, 473, 547) was found to have muscle atrophy in the biceps of the upper extremities (Tr. 470), and muscular weakness in the left arm. (Tr. 411).

Plaintiff argues evidence shows these conditions negatively impacted Plaintiff's ability to engage in activities requiring the use of the hands for fine and gross manipulation and that pain

adversely affected his ability to concentrate (Tr. 49, 52, 612, 619-21) such that the ALJ erred by not considering whether these impairments caused any significant non-exertional limitations in handling and fingering (manipulative limitations) or in sustained concentration and attention (mental limitations). *See* 20 C.F.R. § 404.1569(c); SSR 96-8p, SSR 96-9p; *see Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989) (stating that a non-exertional impairment is significant when it affects an individual residual functional capacity to perform work of which he is exertionally capable).

The ALJ found an RFC that included a limitation to *frequently* reach, handle, and finger. (Tr. 1211). The only evidence discussed by the ALJ that appears related to the severe impairment found is as follows. The ALJ noted Dr. Lembo's November 2011 exam of atrophy of scapular muscles and biceps with mild scapular winging with 5/5 motor strength and intact sensation and December 2011 EMG/NCS showing left cubital tunnel syndrom, mild to moderate and left C5-6 radiculopathy, citing Exhibit 13F. (Tr. 1213). The ALJ noted Dr. Weissglass's October 2012 exam of decreased sensation in the left 3rd-5th fingers, decreased sensation in right hand, and reduced range of motion of left shoulder, citing Exhibit 25F. (Tr. 1213). The ALJ noted an April 2013 left shoulder MRI showing some edema and mild tenosynovitis, citing Exhibit 30F. (Tr. 1213). The ALJ noted a negative x-ray of Plaintiff's left shoulder in January 2014. (Tr. 1213). The ALJ considered the July 2014 exam by Dr. Highsmith of crepitus and weakness with abduction in his left shoulder with significant left shoulder pain, citing Exhibit 33F. (Tr. 1213-14). The ALJ noted after the date last insured Plaintiff fell on his left shoulder and had surgery.

Before concluding generally that Plaintiff's left upper extremity disorder was consistent with RFC found, without mention of any frequency, the ALJ stated: "In addition, although he had some decreased sensation in his hands and fingers, he had normal alternating hand motion and

finger-to-nose motion. Although the claimant's left shoulder condition eventually required surgery in 2015, it resulted from an injury that occurred after the date last insured in March 2015, and such limitations were non-existent through the date last insured. Further, the claimant's prior reports of his ability to go boating, bowl, perform light household chores, and care for his children are inconsistent with a finding of disability." (Tr. 1214). In weighing Dr. Weissglass's opinion, there is further commentary on the left upper extremity: "While I find that the claimant is limited in his ability to use his left upper extremity, I further note that the limitation for the claimant never to reach overhead is more consistent with the record as a whole." (Tr. 1215).

There is no discussion/explanation by the ALJ as to the functional limitations regarding fingering, handling, and reaching not overhead. The bridge from the evidence regarding Plaintiff's left upper extremity to the RFC finding of <u>frequent</u> fingering, handling, and reaching not overhead was not built by the ALJ. *See Lewis v. Berryhill,*858 F.3d 858, 868 (4th Cir. 2017)(internal citations omitted). Without explanation from the ALJ, it is not evident from the record that substantial evidence supports the *frequency* found by the ALJ, and such is not harmless error given the vocational testimony.[6]

As the ALJ's findings on at least three issues are not supported by substantial evidence and this is the third time the record for the relevant period of 2010 to 2014 has been before the undersigned, Plaintiff remaining issues, including but not limited to, explosive personality disorder, seizure disorder, plantar fascial fibromas, and subjective complaints, are not analyzed further. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (declining to address claimant's additional

---

[6] A limitation to sedentary with <u>occasional</u> handling/fingering may preclude a finding of significant number of jobs existing in the national economy in Plaintiff's particular circumstance. (Tr. 56, 685-686, 1257-1258, 1457-1458, 1495, 1506-1507).

arguments). All issues briefed by Plaintiff should be appropriately addressed on remand by the ALJ in accordance with the applicable statutes, rules, regulations, and case law.

### III. CONCLUSION

The court is mindful of the age of this case, the limited relevant period of time before the ALJ, and the multiple prior remands. Thus, the undersigned has taken great pause in deciding how to resolve this matter.[7] Ultimately, the court is constrained by its limited function under 42 U.S.C. § 405(g). Our function is to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). As discussed above, the ALJ's decision is not based on substantial evidence nor an application of the proper legal standard in all steps of the sequential evaluation.[8]

"We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235–36 (4th Cir. 1984)(citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir.1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir.1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.1977)). "The ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say his determination was supported by substantial evidence."

---

[7] The Fourth Circuit has reversed without remanding in cases where significant delay has resulted or would result from the Commissioner's failure to apply the correct legal standard. *See Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir.1987); *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th Cir.1975).

[8] Remand, rather than reversal, is required when the ALJ fails to explain his reasoning and there is ambivalence in the medical record, precluding a court from "meaningful review." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir.2013).

*Seabolt v. Barnhart*, 481 F. Supp. 2d 538, 548 (D.S.C. 2007)(citing *Arnold v. Sec'y*, 567 F.2d 258, 259 (4th Cir.1977) ("The courts ... face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty....")). Due to the errors in the ALJ's decision, it is appropriate to remand to the Commissioner for further action. Upon remand, the ALJ should consider all the arguments set forth by Plaintiff in his brief, and not only those discussed by the court in detail above.

It may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and this case is REMANDED to the Commissioner for further administrative action as set forth above.


                                  s/Thomas E. Rogers, III

March 16, 2021                          Thomas E. Rogers, III
Florence, South Carolina              United States Magistrate Judge